IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

|  |  |  |
|---|---|---|
| OTTO JONES, an individual, RICK TAYLOR, an individual, and BRAD DAVIS, an individual, | ) ) ) | Civil No. 2:06-CV-00084BSJ |
|  | ) |  |
| Plaintiffs, | ) ) | **MEMORANDUM OPINION & ORDER** |
| vs. | ) ) |  |
|  | ) |  |
| MARY E. PETERS, Secretary, U.S. Department of Transportation, J. RICHARD CAPKA, Administrator, Federal Highway Administration, WALTER WAIDELICH, Division Administrator, Federal Highway Administration, Utah Division, and JOHN NJORD, Executive Director, Utah Department of Transportation, | ) ) ) ) ) ) ) ) ) ) | |

```
┌─────────────────────────────────┐
│             FILED               │
│   CLERK, U.S. DISTRICT COURT    │
│  September 21, 2007 (3:24pm)    │
└─────────────────────────────────┘
```

|  |  |
|---|---|
| Defendants, | ) ) |
| FRIENDS OF 114TH SOUTH PROJECT ALTERNATIVE 4, | ) ) ) |
|  | ) |
| Intervenor-Defendant. | ) |

* * * * * * * * *

On January 26, 2006, the plaintiffs commenced this action challenging the Federal

Highway Administration's approval of two highway projects proposed by the Utah Department

of Transportation ("UDOT"): the 10400 South Project and the 11400 South Project. The

plaintiffs contend that such approval violated provisions of the National Environmental Policy

Act of 1969 ("NEPA"), 42 U.S.C.A. §§ 4321 *et seq.* (2003), the Department of Transportation

Act of 1966, 49 U.S.C.A. § 303(c) (1997),[1] and applicable federal regulations.  The plaintiffs

allege that the Federal Highway Administration ("FHWA") failed to meet NEPA's requirements

that the agency take a "hard look" at the environmental effects of the two projects, and fully

review and analyze all reasonable alternatives to the proposed action.  Similarly, plaintiffs assert,

the FHWA failed to satisfy the Department of Transportation Act's requirement that the agency

determine that "there is no prudent and feasible alternative" to the projects' proposed use of lands

that fall within the scope of § 303 of that Act, that is, "publicly owned land of a public park,

recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land

of an historic site of national, State, or local significance."  49 U.S.C.A. § 303(c).[2]

     Plaintiffs also contend that the 11400 South environmental impact study area was defined

too narrowly, and that the FHWA should be required to prepare a "regional" environmental

impact statement encompassing all transportation improvement projects planned for the

southwest portion of Salt Lake County.

------

[1]49 U.S.C.A. § 303(c) reads:

    (c) The Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—

    (1) there is no prudent and feasible alternative to using that land; and
    (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

The language of § 303(c) originated as part of § 4(f) of the Department of Transportation Act of 1966, Pub. L. 89-670, 80 Stat. 934 (1966), *codified at* 49 U.S.C. § 1653(f) (1976 ed.).  Congress revised, renumbered and codified § 303 together with other sections of Title 49 in 1982, and again amended § 303(c) in 1987 to produce the current text.  *See* Pub. L. 97–449, 96 Stat. 2419 (1983); Pub. L. 100–17, title I, § 133(d), 101 Stat. 173 (1987).

[2]At times, counsel refer to this provison as "§ 303(c)," and at other times as "§4(f)" of the "Transportation Act."  Given § 303's codification as positive law as part of Title 49 in 1982, citation to the original session laws version of the Act proves unnecessary, but nonetheless appears to be a common practice where §4(f) is concerned.  Reference herein to "§4(f)" refers to the current version of the section codified at 49 U.S.C.A. § 303(c).

**FACTUAL BACKGROUND**

**A. The 10400 South Project**

10400 South today is a two-lane paved road without paved shoulders, continuous curbs, gutters or sidewalks that serves as a central east-west corridor through the community of South Jordan.  10400 South experiences daily traffic congestion between Redwood Road and 2700 West, and traffic volume is only expected to increase between now and the year 2030.

The FHWA-approved 10400 South Project contemplates expansion of a 2.2-mile stretch of 10400 South between Bangerter Highway and Redwood Road by (1) widening the two-lane road to four lanes with a median left-turn lane on a 106-foot right-of-way; (2) adding bicycle lanes in both directions; (3) establishing ten-foot-wide shoulders to facilitate bus service; (4) improving signalized intersections; and (5) adding curbs, gutters, parking strips and sidewalks.

The area that will be immediately affected by the 10400 South Project is primarily rural/residential, with some commercial development.  Construction of the 10400 South Project will likely require the removal of at least 30 single-family homes, including one historic home, and extending the enclosure of two historic canals in box culverts.  Those who would lose their homes would be forced to relocate.  For those whose homes remain in place in the Project area, the FHWA acknowledges that they would experience "adverse quality of life impacts" resulting from "increased traffic volumes and traffic noise" and "a substantially altered residential environment."[3]  But the agency concluded that these and other impacts will be mitigated in a variety of ways (e.g., erection of "decorative" concrete noise walls), and that taken as a whole,

_____

[3](FHWA, *Finding of No Significant Impact (FONSI) with Environmental Assessment and Section 4(f) Evaluation, 10400 South, Bangerter Highway to Redwood Road*, ("10400 South EA/4(f)") at 3 (April 23, 2004).)

the 10400 South Project will not have a significant effect on the quality of the human environment.  That conclusion was based on the Environmental Assessment ("EA") and Section 4(f) Evaluation prepared by UDOT and its contractor, Horrocks Engineers.[4]  On April 23, 2004, the FHWA issued a Finding of No Significant Impact (FONSI) concerning the 10400 South Project.  In light of the FONSI, the FHWA did not prepare a full environmental impact statement on the Project.  *See* 40 C.F.R. §§ 1501.4(e), 1508.13; *National Audubon Society v. Hoffman*, 132 F.3d 7, 13 (2d Cir. 1997) ("It is only when the proposed action 'will not have a significant effect on the human environment,' 40 C.F.R. § 1508.13, that an EIS is not required.").

### B.  The 11400 South Project

Currently, 11400 South is a two-lane asphalt road without continuous curbs, gutters or sidewalks, traversing east to west across the Salt Lake Valley in two segments, the first originating at a point above 1700 East extending westward past State Street and I-15 to its intersection with Trent Drive (720 West), adjacent to the Jordan River and the Jordan River Parkway; and the other commencing at 1300 West and extending westward to its intersection with the Bangerter Highway (about 3900 West).

The 11400 South Project contemplates the construction of a new interchange between 11400 South and Interstate 15 and the expansion of 11400 South between Bangerter Highway and State Street by (1) widening 11400 South to four lanes with a center left-turn lane; (2) constructing a new bridge across the Jordan River and the Jordan River Parkway; (3) improving intersections on 11400 South and the Jordan Gateway/Lone Peak Parkway; and (4) widening 10600 South to six lanes from Jordan Gateway to a point just beyond the River Front Parkway.

---

[4](*See* 10400 South EA/4(f).)

The planned expansion of 11400 South has already been the subject of federal litigation: in *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002), the court of appeals ruled that the FHWA's existing Environmental Assessment ("EA/4(f)") on the project was deficient in several respects:

> 1. The EA/4(f)'s consideration of alternatives to the Project is inadequate. Serious consideration was given only to the preferred alternative (i.e., the Project as proposed) and a no-build alternative.

> 2. The EA/4(f) fails to consider adequately the Project's impacts including cumulative impacts.

> 3. The EA/4(f) fails to address adequately issues relating to phasing of the Project, particularly given the many-year time frame between the beginning and prospective completion dates for the Project.

> 4. The § 4(f) analysis failed to satisfy the high burden imposed on projects that make use of a public park and/or historic sites.

> 5. The EA/4(f) is fatally flawed by its use of vague, unsupported conclusions and inadequate, incomplete analysis.

*Davis*, 302 F.3d at 1110.  The *Davis* panel also ruled that plaintiffs had shown that the project would "have a significant impact on the environment," *see* 40 C.F.R. § 1508.4, and that NEPA thus requires preparation of a full environmental impact statement, not the Environmental Assessment and Finding of No Significant Impact issued by the FHWA.  *Davis*, 302 F.3d at 1112, 1125-26.[5]

The FHWA's subsequent Final Environmental Impact Statement and Section 4(f) Analysis, issued three years later on June 3, 2005, ("11400 South FEIS/4(f)") undertook to cure

---

[5]*Davis* came before the court of appeals on an interlocutory appeal from the denial of the plaintiffs' motion for a preliminary injunction.  Ironically, based upon input from UDOT concerning its intended changes to the proposed 11400 South Project, the FHWA withdrew its October 13, 2000 FONSI concerning the 11400 South Project on June 20, 2002—the same day that the Tenth Circuit issued its opinion reversing and remanding the denial of the preliminary injunction in *Davis*.  In light of the withdrawal of the FONSI, after remand the *Davis* case was dismissed as moot.  (*See* Memorandum Decision, dated March 31, 2003 (dkt. no. 134), in *Davis v. Mineta*, 2:00-CV-0993PGC (D. Utah).)

these deficiencies by: (1) considering *twelve* initial alternatives in an expanded study area, then narrowed the list to *five* alternatives for more detailed analysis; (2) addressing direct, indirect and cumulative impacts of each of the five alternatives; (3) examining mobility, community and environmental impacts of the construction phasing of the five alternatives; (4) identifying all § 4(f) resources within the study area, evaluating the impact of each of the five alternatives on those resources, and preferring the alternative causing the least harm to those resources; and (5) providing "detailed comprehensive analysis and conclusions, with supporting documentation" included in the FEIS appendices and the larger administrative record.  (11400 South FEIS/4(f), at ES-2.)  Of the five alternatives given more detailed consideration, the final EIS recommends "Alternative 4" —the 11400 South Project as described above—as the "preferred alternative" because it meets the purpose and need of "improving mobility and providing the transportation infrastructure to support economic development within the study area through the year 2030," and because it "will have the least overall net harm to Section 4(f) resources in the study area." (*Id.* at ES-6, ES-7.)

Following a public comment period, the FHWA issued its September 13, 2005 Record of Decision selecting Alternative 4 as the agency's Preferred Alternative because it "best meets the project purpose and need," and because "it also adequately addresses environmental, safety, socioeconomic and Section 4(f) considerations," and concluding that "it is in the best overall public interest to proceed with this project."  *(Record of Decision, 11400 South Final Environmental Impact Statement*, dated September 13, 2005, at 21.)

## THE PLAINTIFFS' CLAIMS

For all of their efforts, plaintiffs contend that as to both the 10400 South and 11400 South projects, FHWA and UDOT have simply repeated many of the same errors enumerated by the court of appeals in *Davis* with respect to the initial 11400 South Environmental Assessment and FONSI, and that the 11400 South FEIS/4(f) and the 10400 South EA and FONSI prove to be deficient in many of the same respects.

### A.  Deficiencies in the 10400 South EA & FONSI

Plaintiffs submit that the FHWA erred in issuing the April 23, 2004 FONSI concerning the 10400 South Project for the same reason that the *Davis* panel ruled that it had erred in issuing its October 13, 2000 FONSI concerning the 11400 South project: that the proposed action will likely have a significant impact on the human environment, requiring the agency to prepare an environmental impact statement rather than issue a FONSI as it did in 2004.  Plaintiffs assert that the FHWA's 10400 South Project FONSI was arbitrary, capricious and not in accordance with law because the agency's 2004 Environmental Assessment identifies impacts due to noise and social disruption and displacement that will plainly have more than a minimal effect on the existing rural/residential area through which the project will be constructed.[6]

In addition, plaintiffs contend that the FHWA failed to take the required "hard look" at the 10400 South Project's direct, indirect and cumulative impacts (*e.g.*, noise, safety, induced

---

[6]The 10400 South EA/4(f) acknowledges that

[m]ore enduring adverse impacts would likely be experienced by residents of properties adjoining the 10400 South corridor whose homes would not be removed.  *These individuals and families would experience a much-altered environmental and social context* due to the removal of numerous nearby homes, disturbance from construction-related noise and dust during the construction period, and increased traffic volumes and noise following project completion.

(10400 South EA/4(f) at p. 3-17 (emphasis added).)

growth), dismissing most such impacts in cursory fashion, without the detailed discussion or searching analysis required by NEPA and the applicable regulations.  They allege, *inter alia*, "the EA/§4(f)'s complete failure to study the Project's impacts on pedestrian safety," such as "significantly less safe conditions for pedestrians due to higher speeds, and longer crossing distances, hence, increased exposure to traffic."[7]

Plaintiffs also assert that the FHWA failed to give proper consideration to alternatives to the proposed action, evidencing a bias in favor of the proposed project that frustrates the purpose of the NEPA and § 4(f) study requirements.  *See* 40 C.F.R. § 1508.9 (2006); 49 U.S.C.A. § 303(c).  Plaintiffs argue that UDOT and the FHWA defined the purpose and need of the 10400 South Project so narrowly as to exclude reasonable alternatives—alternatives that may serve the broader purpose of accommodating present and future transportation needs while lessening or avoiding some or most of the adverse impacts likely to result from implementation of the proposed action.  According to the plaintiffs, "The key purpose and need is to move traffic and people in the region"—that is, "within the southwest quadrant of Salt Lake County"—and under NEPA, "the exercise is to determine how 10400 South will contribute to meeting that purpose and need."[8]

Plaintiffs contend that by emphasizing the importance of "consistency" of the proposed action with detailed local and regional planning documents—in particular, the Wasatch Front Regional Council Long Range Plan (LRP) and the South Jordan Master Plan—UDOT and the FHWA "intentionally foreclosed consideration of all reasonable alternatives and basically reverse

---

[7](Plaintiffs' Opening Brief, filed August 8, 2006 (dkt. no. 42) ("Pltfs' Br."), at 28.)

[8](*Id.* at 37-38, 40.)

engineered the success of" the proposed 10400 South Project as the "Preferred Alternative," failing to comply with NEPA's study requirements.[9]  "Alternatives that could have contributed to the accommodation of regional traffic needs were arbitrarily eliminated prior to analysis simply because they did not meet the planning vision of the WFRC and/or South Jordan," such as alternatives "that would expand capacity on nearby roads such as 12300 South, 11400 South, 9800 South, the proposed Mountain View Corridor, Redwood Road or Bangerter Highway[,] thereby satisfying the regional needs in the Southwest quadrant."[10]  Plaintiffs submit that UDOT and the FHWA also ignored any four-lane alternatives to the proposed action, instead "assuming that the project requires 5 lanes, two travel through lanes and a center turn lane," as proposed by UDOT.[11]

In the plaintiffs' view, the Administrative Record supporting the 10400 South Project FONSI "conclusively demonstrates Defendants did not study in detail any alternatives to the proposed route beyond the Preferred Alternative and No-Build Alternative . . . ."[12]

The plaintiffs likewise find fault with matters that the Environmental Assessment *does* discuss in some detail, particularly the traffic modeling and population projections that UDOT and the FHWA rely upon in evaluating the needed capacity of 10400 South and other east-west traffic corridors.  These flaws, plaintiffs suggest, tend to overstate the need for additional traffic

---

[9](*Id.* at 39 (citing *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997) ("One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence).")).)

[10](*Id.* at 40 (citing *Davis*, 302 F.3d at 1121).)

[11](*Id.* at 42.)

[12](*Id.* at 47.)

lane capacity on 10400 South, particularly when the traffic modeling fails to take into account various mass transit projects which may serve to reduce motor vehicle traffic over time; "the analysis of transit options should include the impact of different sequencing of transportation investments."[13]

### B.  Deficiencies in the 11400 South FEIS/4(f) & ROD

The plaintiffs allege that in preparing the Final Environmental Impact Statement/Section 4(f) Analysis and the Record of Decision on the 11400 South Project, UDOT and the FHWA fail to cure the deficiencies identified by the Tenth Circuit in *Davis* in the prior Environmental Assessment, namely that "it fails to consider reasonable alternatives to the Project," and "it contains an inadequate discussion of the Project's impacts."  *Davis*, 302 F.3d at 1118.

In plaintiffs' view, "The foundation for any viable NEPA document is a well defined and articulated purpose and need."[14]   In this instance, they say, the 11400 South FEIS/4(f) is premised on an overly nebulous statement of purpose and need: to "maintain, protect, and improve the quality of life in the study area by improving mobility and providing transportation infrastructure to support economic development within the study area through the year 2030."[15] Under NEPA regulations, the agency is required to "rigorously explore and objectively evaluate all reasonable alternatives, . . . ."  40 C.F.R. § 1502.14(a) (2006).  Where the purpose and need is stated so generally, plaintiffs submit, the agency's task of measuring whether each alternative will meet the purpose and need becomes exceedingly difficult.

[13] *Id.* at 43 (citing *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1169-71 (10th Cir. 2002)).)

[14] (*Id.* at 57.)

[15] (11400 South FEIS/4(f) at p. 1-5.)

Here, as in *Davis*, the plaintiffs charge that the screening of alternatives reflects an impermissible bias in favor of the proposed 11400 South Project, evidenced by the fact that UDOT and its contractor contractually predetermined the number of alternatives to be initially identified (a maximum of 10), the number of alternatives to be given a detailed analysis (a maximum of 6), and the alternatives were screened using flawed traffic data that were skewed in favor of the proposed action.[16]

The size of the study area may also affect the selection of alternatives to be evaluated. The EIS study area for the 11400 South Project extended from the Bangerter Highway (~3900 West) to 700 East, and from 12600 South to 10600 South.[17]  Plaintiffs argue that this study area was drawn far too narrowly—ignoring guidance offered by the Tenth Circuit in *Davis* that the record in that case "suggests potentially viable alternatives of expanding east-west traffic capacity across the Jordan River *at 9800 South*, 10600 South, and 12300 South," in lieu of building a new river crossing at 11400 South as is currently proposed.  *Davis*, 302 F.3d at 1119 (emphasis added).  Moreover, the 11400 South EIS study area excludes the Mountain View Corridor project west of the Bangerter Highway, which is the subject of a separate EIS; the plaintiffs assert that "the real transportation problem in this area is the need to provide additional North/South travel for residents in the southwest portion of the Salt Lake Valley, thereby obviating the need for those persons to travel to and from I-15 on regional east-west corridors."[18]

Plaintiffs contend that screening of alternatives was based upon flawed traffic modeling,

---

[16] (Pltfs' Br. at 61-63; *see also id.* at 10-12 ¶¶ 19(a)-(f).)

[17] The numeric descriptors "10400 South" and "10600 South" refer to different segments of the same east-west roadway.

[18] (*Id.* at 65.)

and that alternatives were eliminated from analysis even though "these alternatives may actually serve to increase mobility in the area when the traffic projections are calculated correctly."[19]

Plaintiffs also contend that the 11400 South FEIS/4(f) fails to analyze the direct, indirect and cumulative impacts of the proposed action (*e.g.*, an increase in unsafe traffic weaving between the proposed 11400 South I-15 interchange and the existing interchanges at 10600 South and 12300 South), or the cumulative impact of the 11400 South Project taken together with other transportation projects in the area, other than to say that they may have some effect.[20]  Rather than solving mobility problems, the plaintiffs assert that the project will induce greater economic development in more sensitive environmental areas on both sides of the Jordan River—but "the economic development that it appears it will bring . . . is entirely different than that contemplated by the current plans," including up to 1,338,00 square feet of additional commercial space (compared with a "no-build" alternative) that will add to rather than reduce traffic congestion in the study area.[21]  They submit that the FEIS/4(f)'s defective traffic modeling obscures this impact, as well as skewing the traffic volume projected for 11400 South compared with nearby east-west corridors.

Having failed to examine reasonable alternatives in a fashion sufficient to satisfy NEPA requirements, plaintiffs further contend that the 11400 South FEIS/4(f) fails to meet the even more stringent requirements for study of "prudent and feasible" alternatives under § 4(f) of the Department of Transportation Act, 49 U.S.C.A. § 303(c).  Plaintiffs suggest that "it is possible

---

[19](*Id.* at 71; *see id.* at 57-61.)

[20](*Id.* at 67-68.)

[21](Transcript of Hearing, dated March 20, 2007, at 98:13-16, 100:2-101:15 (Mr. Appel).)

and perhaps likely that an alternative that was examined but dismissed during the preliminary NEPA alternative screening process would still be a feasible and prudent avoidance alternative under section 4(f)."[22]  Here, plaintiffs assert, UDOT and the FHWA "relied upon their determinations in the preliminary screening of alternatives to avoid analyzing all prudent and feasible alternatives under the more rigorous Section 4(f) standards," standards that prefer the preservation of parklands such as the Jordan River Parkway over other considerations.[23]

Finally, the plaintiffs submit that all of the proposed transportation projects in the southwest portion of the Salt Lake Valley should have been considered as "cumulative" or "similar" actions, *see* 40 C.F.R. § 1508.25, warranting the preparation of a regional environmental impact statement to take into account the projects' cumulative effects on the environment: "Here," plaintiffs say, "the 10400 South, 11400 [South] and the expansion of Bangerter Highway, construction of the Mountain View Corridor, Redwood Road widening project, construction of the Mid Jordan Light Rail Line, . . . coupled with other proposed or recently constructed transportation projects proposed in the southwest portion of Salt Lake County" and listed in Utah's State Transportation Improvement Plan (STIP) should be evaluated in terms of their cumulative environmental impacts through a single comprehensive analysis.[24]

Underlying the plaintiffs' various objections to both the 11400 South FEIS/4(f) and ROD, and the 10400 South EA and FONSI, are more fundamental doubts about the benefits—and inevitability—of population growth and economic expansion, and genuine misgivings about the

---

[22](Pltfs' Br. at 69.)

[23](*Id.* at 70-71(citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411-12 (1971)).)

[24](*Id.* at 76.)

doom of a cherished rural residential lifestyle, to be supplanted all too soon by unbridled suburban sprawl.

**THE DEFENDANTS' RESPONSE**

UDOT and the FHWA insist that they "did not lightly undertake either the 10400 South or 11400 South projects."  Approval of both projects came "only after comprehensive and methodical planning processes spanning years," including "the development and consideration of numerous alternatives, numerous expert analyses and reviews of likely environmental consequences," along with "careful consultation with other agencies."  The FHWA insists that it "took the requisite 'hard look' at the Projects under NEPA" in selecting the proposed actions as the preferred alternatives, and that it correctly found that "there were no feasible and prudent alternatives" to the proposed actions to the extent that they impact historic and public parkland resources protected by § 4(f) of the Department of Transportation Act.[25]

**A.  The 10400 South EA/4(f) & FONSI**

UDOT and the FHWA point out that 10400 South "is the central east-west corridor through South Jordan," serving the South Jordan community and connecting South Jordan to I-15, Sandy and the east side of the Salt Lake Valley, but is "inadequate to meet either regional or local needs" and "experiences daily traffic congestion between Redwood Road and 2700 West."[26]  The purpose and need for the 10400 South Project is simple, according to the agencies: "to make improvements to the 10400 South Corridor between Bangerter Highway and Redwood

---

[25](Federal and State Defendants' Joint Memorandum in Response to Plaintiffs' Opening Brief, filed November 15, 2006 (dkt. no. 70) ("Defs' Resp. Br."), at 1.)

[26](*Id.* at 2.)

-14-

Road" to meet both current and future east-west local and regional travel demands.[27]  They insist that this statement of purpose and need is reasonable and properly drawn, and was not calculated to exclude reasonable alternatives from consideration as part of the 10400 South environmental assessment.

UDOT and the FHWA acknowledge that local transportation plans were considered in that assessment, but deny that any viable alternatives were eliminated from consideration merely because they were inconsistent with those local plans.[28]  Beginning with thirteen alternatives, the agencies then screened each alternative "by comparing the estimated traffic volume on 10400 South in the year 2030 to the projected capacity of each alternative," and eliminating eight alternatives that failed to meet the projected traffic demand.[29]  The remaining alternatives were then examined in terms of their ability to meet the stated purpose and need, safety impacts, environmental impacts and cost.  In each instance, the agencies report, the proposed 10400 South Project was ranked by the technical study groups as the best approach.[30]

UDOT and the FHWA insist that regional transportation issues were given proper consideration through use of traffic modeling data that took into account other regional projects such as South Commuter Rail and the Mountain View Corridor, and they deny that the traffic modeling data was skewed to favor the proposed action over other alternatives.[31]

---

[27](*Id.* at 2-3.)

[28](*Id.* at 13.)

[29](*Id.*)  The agencies submit that the anticipated traffic volume on 10400 South will exceed 43,000 vehicles per day by the year 2030.  (*Id.* at 11.)

[30](*Id.* at 13-14.)

[31]The agencies argue that it was appropriate to use daily capacity rather than hourly capacity in determining the

(continued...)

UDOT and the FHWA also deny that they were obligated to evaluate the impact of different sequencing of transportation investments—particularly mass transit investments—in screening the alternatives because (1) the plaintiffs did not raise this issue during the NEPA public comment process; (2) the agencies do not read *Utahns for Better Transportation* to create a "transit sequencing" requirement under NEPA, arguing that the language cited by plaintiffs is confined to "the unique facts of that case, which are not remotely similar to the facts here"; and (3) that traffic modeling indicated that travel demand on 10400 South would be "relatively insensitive to changes in planned public transit, most of which is planned to run north-south."[32]

UDOT and the FHWA insist that they took the requisite "hard look" at the social impacts, noise impacts and safety impacts likely to result from the 10400 South Project, and satisfied the requirement to make "a reasonable, good faith objective presentation of those impacts sufficient to foster public participation and informed decision making" through the project's Environmental Assessment. *Colorado Envt'l Coalition v. Dombeck*, 185 F.3d 1162, 1177 (10th Cir. 1999).

The 10400 South EA/4(f) acknowledged the likelihood of some adverse social and noise impacts, but noted that outside of the immediate vicinity of the construction, the project will have "'little if any influence on patterns of social interaction or social cohesion,'" and that the social impacts are also associated with population growth and would likely occur whether or not the

---

[31](...continued)
road's "Level of Service (LOS)"; that the projected capacity of 10400 South was "refined over time to reflect the actual characteristics of 10400 South" and was thus reduced from 20,000 to 13,000 vehicles per day; and that the modeling included proposed transit routes on the Redwood Road and Mountain View Corridor.  (*Id.* at 33-35.)

[32](*Id.* at 16-18.)

-16-

10400 South Project is built.[33]  They now assert that it was neither arbitrary nor capricious for the FHWA to conclude that there was not a significant difference between the impacts of the preferred alternative and the "no-build" alternative, and that the 10400 South Project will not have a "significant' social impact requiring preparation of an environmental impact statement.[34]

The agencies similarly found no significant difference in noise impacts between the preferred alternative and the "no-build" alternative: "After mitigation through noise walls, 39 residences would be impacted by a sound level of 65 dBA or greater, only nine more than under the no-build alternative."[35]  Yet even without mitigation, the agencies concluded that the noise impacts of the 10400 South Project are not significant,[36] and now argue that it was not arbitrary or capricious to so conclude.

UDOT and the FHWA dispute the plaintiffs' allegations concerning impacts on safety, arguing that the 10400 South Project will *improve* pedestrian and bicyclist safety within that corridor, given the proposed 106-foot right-of-way.  The existing two-lane roadway has narrow travel lanes and shoulders and lacks continuous sidewalks, bicycle lanes, curbs and parking strips—features that would provide for increased safety by increasing the distance between pedestrians, bicyclists and motor vehicles.  Approving the construction of such features, the agencies submit, cannot be deemed arbitrary or capricious where pedestrian/bicyclist safety is

---

[33](*Id.* at 19-22.)

[34](*Id.* at 22.)

[35](*Id.* at 23.)

[36](*Id.* at 24.)  In circular fashion, the agencies argue that if in fact the unmitigated noise impacts *are* "significant," then the persons affected will likely request mitigation and thus "any such impact would be greatly lessened."  (*Id.* at 24 n.13.)

concerned.[37]

Concerning indirect and cumulative impacts,[38] the 10400 South EA/4(f) had identified 18 categories of potential indirect or cumulative impacts, and determined that the 10400 South Project would have *no* indirect or cumulative impacts in eleven of those categories.[39]  The 10400 South EA/4(f) concluded that in the remaining categories, any indirect or cumulative impact would not be "significant."  For example, as to impacts on "Land Use and Farm Lands," the agencies assert:

> With or without the project, full build-out of South Jordan is expected by 2030, and the 2030 land use plan does not include any agricultural land. . . . Thus, while the project may have slight indirect and cumulative impacts on the pace of development, that impact will not be significant, and by 2030 land use in the project area will be substantially the same regardless of whether the project is built.[40]

The agencies defend this and other findings of *in*significance concerning social and economic conditions, visual resources, relocations, and cultural resources as being neither arbitrary nor capricious.

Emphasizing the applicable standards of review, UDOT and the FHWA urge this court to find that the 10400 South EA/4(f) complies with NEPA: "[t]he purpose and need for the 10400 South Project is clearly and reasonably articulated"; the agencies considered "a full range of

---

[37](*Id.* at 25-27.)

[38]The agencies acknowledge that "NEPA obligates an agency to discuss the cumulative impacts of the proposed action 'when added to other past, present, and reasonably foreseeable future actions.'" (*Id.* at 27 (quoting 40 C.F.R. § 1508.7).)

[39](*See* 10400 South EA/4(f), at p. 3-71 (table).)

[40](Defs' Resp. Br. at 30.)  The 10400 South EA/4(f) thus gives little credence to residents' expressed concerns that the 10400 South Project will "hasten the disappearance of a 'rural lifestyle' that originally attracted many residents to this area."  (EA/4(f) at p. 3-14.)

alternatives before reaching the preferred alternative"; and having identified the preferred

alternative, they provided "a good faith and objective presentation of the project's direct, indirect,

and cumulative impacts," concluding that the 10400 South Project "will not have a significant

impact on the human environment."[41]   It follows that the FONSI issued by the FHWA concerning

the 10400 South Project is sustainable under the applicable NEPA standards.

UDOT and the FHWA likewise submit that their evaluation of the 10400 South Project

complies with § 4(f) of the Department of Transportation Act and the applicable regulations, *see*

23 C.F.R. § 771.135 (2006), based upon the determination that there is no prudent and feasible

alternative to using resources protected by the statute, and all possible planning has been

undertaken to minimize harm to the parklands or historic sites affected.[42]

As noted above, the widened 10400 South right-of-way will "use" § 4(f) resources by

requiring the demolition of one historic home and the extension of box culverts on two historic

canals. Arguing that "alternatives that do not meet the project's purpose and need are not feasible

and prudent under Section 4(f)," UDOT and the FHWA rejected a "no-build" alternative and a

---

[41](Def's Resp. Br. at 35.)

[42]Section 4(f) restrictions apply anytime a proposed highway construction project entails a "use" of a Section 4(f)-protected property.  Once the property is determined to be a § 4(f) property, "the Secretary of Transportation can approve the use of such publicly-owned parkland or historic sites for highway construction only if 'there is no prudent and feasible alternative to using that land,' 49 U.S.C. § 303(c)(1), and only after the Secretary has performed 'all possible planning' in the project 'to minimize harm to the park ... or historic site resulting from the use.' *Id.* § 303(c)(2)."  *Davis*, 302 F.3d at 1118.  As the court of appeals explains:

A "use" of a protected property may be "direct" ("[w]hen land is permanently incorporated into a transportation facility") or "constructive" ("when the transportation project does not incorporate land from a section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired.").  23 C.F.R. § 771.135(p)(1)(i), (p)(2).

*Valley Community Preservation Com'n v. Mineta*, 373 F.3d 1078, 1085 (10th Cir. 2004).
The FHWA has determined, through regulation, that the agency's 4(f) evaluations should be presented in the EA or EIS.  23 C.F.R. § 771.135(i).

90-foot right-of-way alternative (12B) because they failed to meet the stated purpose and need, and because the latter alternative would have essentially the same impact on § 4(f) resources—one historic house and two canals—as the preferred 106-foot right-of-way alternative approved by the FHWA, and would have greater impacts on other resources, such as increased cost.[43] They now assert that it was not arbitrary or capricious to do so.

## B.  The 11400 South FEIS/4(f) & ROD

The agencies' arguments in defense of the 11400 South FEIS/4(f) and ROD largely echo those advanced in defense of the 10400 South EA/4(f) and FONSI: (1) considered in context, the FEIS statement of purpose and need proves to be defined sufficiently to satisfy NEPA; (2) the FEIS/4(f) study area satisfies NEPA and comports with *Davis*; (3) the FEIS/4(f) properly identified, screened and analyzed reasonable alternatives to the proposed action, without predetermination or bias, through a process that satisfies all NEPA requirements; (4) NEPA imposes no general "transit sequencing alternative" requirement; (5) the FEIS/4(f) adequately analyzed and explained the direct, indirect and cumulative impacts of the 11400 South Project; and (6) the FHWA's § 4(f) analysis evaluated the preferred alternative's impacts on § 4(f) resources and correctly found no feasible and prudent alternative to the proposed action that would meet its purpose and need.  UDOT and the FHWA insist that they have rectified the deficiencies of the prior environmental assessment of the 11400 South Project identified by the Tenth Circuit in *Davis*, and have satisfied NEPA and § 4(f) requirements through the detailed analysis and substantive content of the FEIS/4(f) and the thorough examination of the proposed action in the public process leading to the FHWA's Record of Decision approving the project.

---

[43](Defs' Resp. Br. at 39.)

UDOT and the FHWA deny that the project's statement of purpose and need is "nebulous," particularly when considered in the actual context of the FEIS and its stated "comparison criteria" that bear upon "improving mobility" or "supporting economic development."  They assert that "by carefully defining what that term meant in the context of the purpose and need statement, and providing comparison criteria for each quality of life-based component, the purpose and need statement served its purpose."[44]  While early comments by the Environmental Protection Agency (EPA) and others were critical of the draft purpose and need statement, the agencies explain that they refined the statement to satisfy those concerns.

The Tenth Circuit in *Davis* criticized the agencies for failing to "study the alternatives, separately or in combination, of expanded capacity over the Jordan River at 12300 South and 10600 South and a new crossing at 9800 South."  *Davis*, 302 F.3d at 1121.  The agencies point out that the Jordan River crossing at 9800 South has since been built, and that even though the FEIS study area is bordered on the north by 10600 South, the effect of the four-lane 9800 South crossing was actually taken into consideration in the traffic modeling used in preparing the 11400 South FEIS/4(f).[45]  Thus, the agencies submit, the FEIS study area was directly responsive to the *Davis* critique rather than conflicting with it, as plaintiffs allege.

UDOT and the FHWA assert that their "development of alternatives for the 11400 South EIS was an uncommonly thorough and transparent process" that was specifically designed to respond to the Tenth Circuit's *Davis* critique of the prior environmental assessment; "all of the alternatives in the EIS include combinations of various roadway improvements," including

---

[44](*Id.* at 45.)

[45](*Id.* at 50.)

-21-

Transportation System Management and mass transit improvements that had been omitted from the prior 11400 South environmental assessment.[46]

The agencies deny that the screening of alternatives was predetermined, biased or arbitrarily delimited, whether because of contract terms between UDOT and its consultant, or otherwise.  Screening began with *twelve* alternatives (not ten), three of which originated in response to public input.  The alternatives included major improvements to as many as seven corridors, and several of them omitted the construction of a new I-15 interchange and Jordan River crossing at 11400 South.  Detailed traffic modeling and cost estimates were applied to all twelve alternatives, and in fact, "all twelve had been developed to a level of detail not contemplated" in the original UDOT contract documents cited by the plaintiffs.[47]

UDOT and the FHWA insist that as it transpired, the actual screening of the twelve alternatives was reasonable, using ranking criteria such as "critical intersections at or over capacity, interchanges at or over capacity, and I-15 ramps or freeway segments at or over capacity" to determine whether each alternative would "improve mobility" within the EIS study area.[48]

UDOT and the FHWA also maintain that their examination of the 11400 South Project's direct, indirect and cumulative effects described in the FEIS/4(f) was both reasonable and adequate to satisfy NEPA requirements.  They deny that the construction of an I-15 interchange at 11400 South will cause dangerous weaving of I-15 vehicle traffic between the 10600 South

---

[46](*Id.* at 52-53.)

[47](*Id.* at 59-62.)

[48](*Id.* at 66.)

interchange and 11400 South, and they dispute the analysis proffered by the plaintiffs' expert, Lucinda Gibson, that would indicate otherwise.  The agencies argue that their own expert, Steve Pouliot, prepared a traffic modeling analysis that presents "a more reasonable representation of freeway conditions on I-15," one that "render[s] a more realistic forecast" of future traffic conditions on I-15, and they reiterate that "'agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious.'"[49]  They submit that the existence of contradictory evidence or disagreement over scientific conclusions "'does not invalidate the agencies' actions or decisions.'"[50]

Nor do the agencies concede that the 11400 South FEIS/4(f) understates the increased traffic burden resulting from the economic impact of the 11400 South Project, specifically the nearly 1.3 million square feet of retail development that plaintiffs allege will occur if the project is completed, but allegedly would *not* occur under a "no-build" alternative.  They supplement the FEIS/4(f) with the opinion of their expert, Mr. Pouliot, that taking the plaintiffs' economic forecast into account, construction of the "preferred" alternative would result in traffic at six critical facilities that would reach or exceed capacity by 2030, in contrast with an adjusted "no-build" alternative that would have at least seven critical traffic facilities at or over capacity by 2030.[51]

Far from making conclusory statements concerning indirect impacts on regional economic growth, UDOT and the FHWA assert that the 11400 South FEIS/4(f) makes a

---

[49](*Id.* at 69 (quoting *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001) (internal quotation omitted).)

[50](*Id.* at 69-70 (quoting *Custer County*, 256 F.3d at 1036).)

[51](*Id.* at 71-74; *see* Declaration of Stephen G. Pouliot, PE, dated November 27, 2006, at 8-11 ¶¶ 22-34.)

-23-

"methodical assessment of induced (indirect) growth," discussing land use imapcts for each alternative—a "hard look" that "goes far beyond a 'conclusory statement that growth will occur with [or] without the project' and easily satisfies NEPA."[52]

Positing that "[a]gencies have substantial discretion as to the extent of the cumulative impacts assessment," UDOT and the FHWA point to Section 4.19 of the FEIS/4(f), which "describes the reasonably foreseeable future activities that could result in cumulative impacts" and lists "past and present projects in and near the study area."[53]  That section identifies the resources expected to be subject to cumulative impacts from the 11400 South Project in combination with other past, present and future projects: "land use (transportation facilities; location, density and type of development; agricultural land); wetlands, wildlife habitat; water quality; floodplains, and historical and archeological resources," and it "succinctly describes the potential cumulative effects."[54]  The agencies recount that the FEIS/4(f)'s summary of cumulative impacts was derived from an interdisciplinary workshop on cumulative impacts of the 11400 South Project; the workshop's 72-page report is included in the Administrative Record at pages 16272 through 16274.  They dispute the plaintiffs' assertion that the FEIS/4(f) overlooked cumulative impacts on pedestrians, equestrians, bicyclists, farmlands, residential and commercial relocations, economic and social conditions, arguing that if anything, the 11400 South Project's proposed bicycle lanes, sidewalks, parking strips, pedestrian/equestrian crossings and other roadway improvements will enhance the safety of pedestrians and bicyclists by

---

[52](*Id.* at 74-75.)

[53](*Id.* at 75-76 (citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376-77 (1989)).)

[54](*Id.* at 76.)

distancing them from the ever-increasing flow of motor vehicle traffic in the corridor.[55]

Residential relocations, the agencies submit, are "largely personal, temporary, and spatially

distinct, and therefore not particularly cumulative in nature," as are any negative economic and

social impacts attributable to constructing the project.[56]  Other impacts, such as increased noise,

are direct, local, immediate and transitory, having little *cumulative* impact in relation to other

projects in the region.

Given the limited cumulative impacts of the proposed action, UDOT and the FHWA

submit that the 11400 South FEIS/4(f)'s treatment of those impacts offers "a methodical,

reasonable assessment" that satisfies NEPA requirements.[57]

Beyond NEPA's procedural requirements, UDOT and the FHWA assert that the 11400

South FEIS/4(f) satisfies the substantive requirements of § 4(f) of the Department of

Transportation Act of 1966, as did the 10400 South EA/4(f) and FONSI. Section 4(f), the

agencies explain, "prohibits the use of land from a publicly owned park, recreation area, wildlife

or waterfowl refuge, or a historic site for a transportation project unless (1) there is no prudent

and feasible alternative to using the land, and (2) all possible planning is taken to minimize harm

to the park or recreation area."  They submit that they "conducted comprehensive analysis of the

11400 South Project and reached the reasonable conclusion that there were no[] feasible and

prudent alternatives to the 11400 South Project which would impact fewer Section 4(f) resources

---

[55](*Id.* at 77-78.)

[56](*Id.* at 78-79.)

[57](*Id.* at 79.)

than the proposed project."[58]

UDOT and the FHWA identified nine § 4(f) park, recreation and wildlife resources and 46 historic properties within the 11400 South Project study area.  Because the proposed action involves vehicular travel improvements, the agencies concluded that roads must be constructed and/or widened, particularly along east-west traffic corridors traversing resources such as the Jordan River Parkway, running primarily north and south, and as a consequence, they found "no prudent alternative which would avoid all of the identified Section 4(f) resources."[59]  They reject a "no-build" alternative—which would make no additional use of § 4(f) resources—because "an alternative which does not meet a project's purpose and need is not prudent" within the meaning of § 4(f).

Given this premise, UDOT and the FHWA insist that they examined the alternatives to determine "which would cause the least overall net harm to those resources," given "all possible planning to avoid and minimize harm," as reflected in Sections 5.6 through 5.8 of the FEIS/4(f).[60] Remarkably, they concluded that the preferred alternative "was found to have the least overall net harm"—at least after minimizing the impact of constructing a new Jordan River crossing at 11400 South, namely, "'the minor relocation of the existing Jordan River Parkway trail'" and a new bridge over the river and parkway that will have "'new noise and visual impacts to the users of the trail.'"  UDOT and the FHWA deem those impacts to be insignificant: "'the agencies with jurisdiction (Division of Parks and Recreation, South Jordan and Draper) do not consider the

---

[58](*Id.* at 79 (citing 49 U.S.C. § 303(c)).)

[59](*Id.* at 80.)

[60](*Id.* at 81.)

crossing to have significant recreational impacts or to be inconsistent with their plans for the Jordan River Parkway or Trail.  Nor is this crossing expected to significantly impair or reduce use of the trail.'"[61]   The 11400 South FEIS/4(f) reports that the preferred alternative would impact § 4(f) historic resources at 18 locations, including removal of a historic canal bridge at 11400 South and 200 West; nonetheless, the agencies insist that it would have the least impact on historic resources of all of the "build" alternatives.[62]

UDOT and the FHWA argue that they rejected "build" alternatives that omit the new 11400 South river crossing because those alternatives would have significantly greater adverse impacts in neighboring areas; widening the Bangerter Highway or the proposed Mountain View Corridor "would require the relocation of over 500 homes and businesses, and would cost three to seven times more [than] the other build alternatives. . . . There is nothing arbitrary or capricious in the conclusion that impacts of such a magnitude were unacceptable . . . ."[63]

They now urge the conclusion that the "administrative record amply demonstrates that the Agencies identified all protected properties impacted by the 11400 South Project, determined that [there] were not feasible and prudent alternatives to those impacts, and then acted appropriately to minimize those impacts.  Neither this procedure nor its results can be characterized as arbitrary [or] capricious."[64]

---

[61](*Id.* at 81 (quoting 11400 South FEIS/4(f) at p. 5-47).)  According to the agencies, the preferred alternative will make the least use and cause the least harm to § 4(f) recreational and wildlife resources because it will use "one park property" in a way that is "consistent with State and city park plans and city transportation plans" and will use "one wildlife resource."  (11400 South FEIS/4(f), at p. 5-47.)

[62](*See* 11400 South FEIS/4(f), at pp. 5-48, 5-50, 5-51.)

[63](Defs' Resp. Br. at 82-83.)

[64](*Id.* at 83.)

Finally, both UDOT and the FHWA dispute the plaintiffs' assertion that the pertinent circumstances in the southwest quadrant of Salt Lake County—*viz.*, the ongoing planning and building of forty projects that are designed to meet the same regional transportation needs— warrant the preparation of a "regional" environmental impact statement encompassing all of those projects.  They contend that planning documents such as Transportation Improvement Plans (TIP) developed by a Metropolitan Planning Organization (such as the Wasatch Front Regional Council)[65] and State Transportation Improvement Plans (STIP) are not subject to NEPA, pointing out that in 2006, Congress amended the statute to provide that NEPA does not apply to TIPs or STIPs, *see* 23 U.S.C.A. §§ 134(p), 135(j) (Supp. 2007): "Congress' decision to preclude NEPA review of STIPs and TIPs themselves, and to confirm the current practice of project-by-project NEPA review instead, makes sense and reflects strong deference to the role of the states in transportation planning."  STIPs and TIPs are planning documents, not approvals of proposed projects, and "[f]or those projects listed in the TIP or STIP that entail federal approval or funding (like 11400 South and 10400 South), it is appropriate that NEPA apply once the project is advanced to the proposal stage."[66]

They also argue that the plaintiffs have not identified the projects in question as "connected actions" for NEPA purposes,[67] particularly under FHWA regulations implementing

---

[65]The agencies point out that under the federal aid to highways program, the preparation and periodic updating of Transportation Improvement Plans by local planning agencies is mandatory, *see* 23 U.S.C.A. § 134(g)-(j), but such planning does not constitute a federal agency action triggering the NEPA review requirements.

[66](Defs' Resp. Br. at 85.)

[67]40 C.F.R. § 1508.25(a) (2006) defines "connected actions" as follows:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(continued...)

NEPA requirements. *See* 23 C.F.R. § 771.111 (2006).[68] They insist that the 11400 South Project stands alone (as does the 10400 South Project), and that their respective EIS study areas are defined in terms of the logical termini of each project, that each has independent utility, and that neither project restricts the consideration of alternatives for other planned projects in the region.[69] Moreover, the agencies continue, neither action automatically triggers the other, each project would proceed if the other project was not constructed, and neither is dependent upon a larger project for its justification: "both the 11400 South Project and the 10400 South Project will individually alleviate traffic problems in the area, and neither depends upon the other in order to serve its transportation purpose," and consequently "there was no need to combine the projects in a single EIS."[70]

---

[67](...continued)
(i) Automatically trigger other actions which may require environmental impact statements.
(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

[68]23 C.F.R. § 771.111(f) (2006) reads:

 (f) In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:
 (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;
 (2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and
 (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

[69](Defs' Resp. Br. at 88-89.)

[70](*Id.* at 90.)  UDOT and the FHWA also deny that the 11400 South Project is "cumulative" of, or "similar" to other projects, warranting a regional EIS.  *See* 40 C.F.R. § 1508.25(a)(2) ("Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement."); 40 C.F.R. § 1508.25(a)(3) ("Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.")

**THE ROLE OF THE COURT IN REVIEWING PROJECT APPROVALS**

The role of a court in reviewing agency decision-making is limited.  A reviewing court "is not to determine the *correctness*, in some ultimate sense, of an agency's actions" but "is limited to determining only the *legality* of the challenged action."  *Di Vosta Rentals, Inc. v. Lee*, 488 F.2d 674, 678 (5th Cir. 1973) (emphasis in original).  In short, a reviewing court may not substitute its own judgment for that of the agency.  *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 555 (1978).

**A. NEPA Review**

The purpose of the National Environmental Policy Act ("NEPA"), 42 U.S.C.A. §§ 4321-4370d (2003), is to focus the attention of federal agencies and the public on a proposed agency action so that the environmental consequences of the action can be studied and considered before a decision is made.  NEPA requires agencies "to consider environmentally significant aspects of a proposed action, and, in so doing, let the public know that the agency's decisionmaking process includes environmental concerns."  *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002) (citing *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. 87, 97 (1983)).  NEPA achieves this end by imposing procedural requirements, not substantive ones: "NEPA prescribes the necessary process, but does not mandate particular results.  *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989)).  "Accordingly, agencies are not required to elevate environmental concerns over other valid concerns."  *Id.* at 1162-63 (citing *Baltimore Gas & Elec.*, 462 U.S. at 97).  "So long as the record demonstrates that the agencies in question followed the NEPA procedures, which require agencies to take a 'hard look' at the environmental

consequences of the proposed action, the court will not second-guess the wisdom of the ultimate

decision."  *Id.* at 1163 (citing *Robertson*, 490 U.S. at 350).

> ''The role of the courts in reviewing compliance with NEPA 'is simply to ensure
> that the agency has adequately considered and disclosed the environmental impact
> of its actions and that its decision is not arbitrary and capricious.'"  *Utah Shared
> Access Alliance v. United States Forest Serv.*, 288 F.3d 1205, 1208 (10th Cir.
> 2002) (quoting *Baltimore Gas*, 462 U.S. at 97–98).  We apply a rule of reason
> standard (essentially an abuse of discretion standard) in deciding whether claimed
> deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat the
> goals of informed decisionmaking and informed public comment.  *Custer County
> Action Assoc. v. Garvey*, 256 F.3d 1024, 1036, 1040 (10th Cir. 2001); *see also
> Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 377 n. 23 (1989) (noting
> similarity between the "reasonableness'" and "arbitrary and capricious" standards.)

*Id.*

In reviewing agency action for compliance with NEPA requirements, the reviewing court

should overturn the decision of an administrative agency if the decision was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  *Colorado Wild v.

United States Forest Service*, 435 F.3d 1204, 1213 (10th Cir. 2006).[71]  The burden of

demonstrating that the agency's decision was arbitrary, capricious, etc., rests upon the plaintiffs.

*See, e.g.*, *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).

Both NEPA, *see* 42 U.S.C.A. § 4332, and the Council on Environmental Quality

("CEQ") regulations implementing the Act, 40 C.F.R. §§ 1500-1517 (2006), require an agency to

appraise environmental impacts of proposed federal actions that may significantly affect the

---

[71]UDOT and the FHWA point out that NEPA and § 4(f) of the Department of Transportation Act do not
provide independent causes of action, and thus this action depends upon the Administrative Procedure Act ("APA"), 5
U.S.C. § 701 *et. seq.*  Under the APA, this court can set aside the decisions to approve the 10400 South Project and the
11400 South Project only if it finds those decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law"—the APA standard of review of agency action.  *Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402, 416 (1971); 5 U.S.C.A. § 706(2)(A).

quality of the human environment.[72]  When an agency proposes a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C.A. § 4332(2)(C), NEPA requires preparation of an Environmental Impact Statement ("EIS") in which the agency must examine: (1) the impacts of the proposed action; (2) any adverse environmental effects of the action that cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between local, short-term uses of the environment and the maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable commitment of resources which would be involved.  *See* 42 U.S.C.A. § 4332.[73]

An agency need not prepare an EIS if it conducts an environmental assessment and determines that the proposed action will not significantly affect the human environment.  *See* 40 C.F.R. § 1501.4 (2006).  In that event, the agency may issue a Finding of No Significant Impact (FONSI) based upon the environmental assessment.  40 C.F.R. §§ 1501.4(e), 1508.13. "Otherwise, it must prepare an EIS."  *Davis*, 302 F.3d at 1112.

When we review an EA/FONSI to determine whether an EIS should have

---

[72]Pursuant to the requirements of NEPA and in accordance with the CEQ regulations, additional policies and procedures governing the FHWA in approving highway projects under NEPA are set forth in Title 23 of the C.F.R.  *See* 23 C.F.R. §§ 771.101 through 771.131 (2006); *see also* 40 C.F.R. § 1507.3 (2006) (directing that "each agency shall as necessary adopt procedures to supplement these regulations"); *Environmental Impact and Related Procedures — Final Rule*, 52 Fed. Reg. 32646-32660 (Aug. 28, 1987) (rulemaking commentary and section-by-section analysis).

[73]The CEQ regulations provide detailed guidance regarding the scope and content of an Environmental Impact Statement.  *See* 40 C.F.R. §§ 1502.1-1502.25 (2006).

A federal agency is not required, however, to prepare an EIS prior to taking any action.  NEPA and the CEQ regulations recognize that the determination whether a planned project will have a *significant* impact may itself require environmental analysis.  *See* 40 C.F.R. § 1508.27(a), (b)(1)-(10) (2006) (defining "significantly").  Accordingly, an agency can satisfy its obligations under NEPA by determining whether the proposed action is one that normally requires an EIS or normally does not require an EIS, or if neither, by preparing an Environmental Assessment ("EA") to provide sufficient evidence and analysis for determining whether to prepare a full EIS.  40 C.F.R. § 1501.4(a), (b).  The preparation of an EA leads to one of two findings: (1) that an EIS must be prepared because of potentially significant impacts resulting from the proposed action; or, (2) a Finding of No Significant Impact (FONSI) – a formal finding that the proposed action will not have significant impacts on the human environment, and thus that preparation of an EIS is not required.  *See* 40 C.F.R. §§ 1501.4(c)-(e); 40 C.F.R. §1508.13 (discussing findings of no significant impact).

been prepared, we must determine whether the agency acted arbitrarily and capriciously in concluding that the proposed action "will not have a significant effect on the human environment." Thus, our review of an EA/FONSI has a substantive component as well as a component of determining whether the agency followed procedural prerequisites. If the plaintiffs can demonstrate substantively that the FHWA's conclusion of non-significant effect on the environment represents a "clear error of judgment," then that conclusion must be reversed. *Utah Shared Access Alliance*, 288 F.3d at 1213.

*Id.*

The scope of this court's review is limited to the administrative record before the agency when it made its decision. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994). Plaintiffs submit that

> [a] simple but fundamental rule of administrative law is that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. *Burlington Truck Lines, Inc. v. United States General Drivers and Helpers Union*, 371 U.S. 156, 169 (1962). If those grounds are inadequate or improper, the court is powerless to affirm the administrative action. *Id.* Because of that requirement, the grounds upon which the agency acted must be clearly disclosed in and fully sustained by the Record. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994). After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles. *Id.*

(Plaintiffs' Reply Brief, filed December 21, 2006 (dkt. no. 77) ("Pltfs' Reply Br."), at 17.)

An agency action will be set aside as arbitrary unless it is supported by "substantial evidence" in the Administrative Record. *Olenhouse*, 42 F.3d at 1575. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pennaco Energy v. United States Dep't of the Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004). It is not necessary that all the evidence in the Administrative Record or, indeed, even the weight of

-33-

that evidence, support the agency decision.  The fact that conflicting views are expressed, particularly where, as here, there is opposition to the project, does not thereby render the agency decision invalid.  The agency must consider all the relevant factors and credible evidence in the record to support its decision.  The court's role is only to assess whether the agency's decision is "within the bounds of reasoned decisionmaking."  *Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983).

As the Second Circuit observed some years ago, "This Court is neither required, equipped or inclined to resolve fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation that construction of the proposed expressway is the most viable solution to projected travel needs in the future."  A reviewing court "does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it de novo for the evidence received and considered by the agency which prepared the EIS."  *Citizens for Balanced Env't and Transp. v. Volpe*, 650 F.2d 455, 462 (2d Cir. 1981) (citations and internal quotation marks omitted).

On the other hand, agency action should be set aside if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Manufacturers v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

**B.  Section 4(f) Review**

With regard to review under § 4(f) of the Department of Transportation Act, there are

special rules pertaining to the standards reviewing courts apply "because § 4(f) conditions

approval of a transportation project through a park upon a finding 1) that there is no prudent and

feasible alternative to using the land and 2) that the project includes all possible planning to

minimize harm to the park." *Davis*, 302 F.3d at 1113.  In *Davis*, the court of appeals outlined

judicial review of agency decisions under § 4(f) as a three-step process:

> In the first step, the reviewing court must decide whether the Secretary of
> Transportation acted within the scope of his authority.  *Boomer Lake*, 4 F.3d at
> 1549.  This inquiry requires the district court to examine whether "the Secretary
> could have reasonably believed that in this case there are no feasible alternatives
> or that alternatives do involve unique problems." *Id.* (quotation omitted).  The
> review of this issue centers on whether "there is no prudent and feasible
> alternative" to construction of the project over land protected by § 4(f).  49 U.S.C.
> § 303(c).  Section 4(f) "requires the problems encountered by proposed
> alternatives to be 'truly unusual' or [to] 'reach extraordinary magnitudes' if
> parkland is taken." *Boomer Lake*, 4 F.3d at 1550 (quotation omitted).

*Id.* at 1113-14 (quoting *Committee to Preserve Boomer Lake Park v. Department of Transp.*, 4

F.3d 1543, 1549, 1550 (10th Cir. 1993)).  "In the second step, the reviewing court examines

whether the Secretary's decision was arbitrary, capricious, an abuse of discretion or otherwise not

in accordance with law." *Id.* at 1114 (citing *Boomer Lake*, 4 F.3d at 1549).

> Here, the court asks whether the Secretary's decision was based on a
> consideration of the relevant factors and whether the Secretary made a clear error
> of judgment. *Id.*  In assessing this factor, the reviewing court must conduct a
> careful and searching inquiry into the facts; however, once it becomes satisfied
> that the Secretary took a "hard look" at the relevant factors, the court should not
> substitute its judgment for that of the agency. *Id.* at 1551.

*Id.* (citing *Boomer Lake*, 4 F.3d at 1551).  "Finally," *Davis* explains, "the reviewing court asks

whether the Secretary followed the necessary procedural requirements in reaching his decision."

*Id.* (citing *Boomer Lake*, 4 F.3d at 1549).[74]

Section 4(f) analysis differs from NEPA review because NEPA's requirements call upon the court to scrutinize the agencies' decisionmaking *process* in evaluating the environmental impacts of a proposed action without reference to substantive policy choices, while review of the agencies' § 4(f) analysis weighs the agency's *substantive* choices in light of the statute's express preference for the preservation and protection of public recreational, wildlife and historic resources as well as examining the agency's process in evaluating alternatives and planning to minimize adverse impacts on § 4(f) resources.

In *Davis*, the Tenth Circuit concluded that the FHWA's prior § 4(f) analysis of the 11400 South Project did not present an adequate discussion of alternatives: "[m]any alternatives were improperly rejected because, standing alone, they did not meet the purpose and need of the Project." 302 F.3d at 1122. "Cumulative options," the *Davis* panel wrote, "were not given adequate study." *Id.*

> In addition to the possibility of expanding existing roads, options involving Transportation System Management (TSM) and mass transit were eliminated from study under the EA. The EA/4(f) rejected these options because, standing alone, they would not meet the purpose and need of the Project. However, no effort was made to consider TSM and mass transit together and/or in conjunction with alternative road expansion as a means of meeting Project goals. * * * *
>
> [B]ecause of the need of FHWA to engage in "all possible planning," the failure of the EA carefully to consider mass transportation, particularly in combination with other alternatives, is not justified. "[A]ll possible planning" requires consideration of whether reasonable resources currently planned for extension of 11400 South across the Jordan River might instead be effectively directed toward expansion of mass transit and other traffic management strategies that could adequately meet the needs and purpose of the Project in a way that avoids the

---

[74]Of course, the court of appeals reviews a district court's conclusions on all three of these issues *de novo*, "according no deference to the district court's conclusions." *Davis*, 302 F.3d at 1114.

adverse impact on parkland or historic structures.

*Id.* at 1121, 1122 (footnote omitted).

## FHWA APPROVAL OF THE 10400 SOUTH & 11400 SOUTH PROJECTS

This court has examined in detail the 10400 South EA/4(f) and FONSI, the 11400 South FEIS/4(f) and ROD, and has perused the extensive Administrative Record detailing the NEPA and § 4(f) processes undertaken by UDOT and the FHWA over a period of several years in analyzing and evaluating both projects.  At the hearing on March 20th and 21st, the court heard extensive argument by counsel concerning the array of NEPA and § 4(f) compliance issues raised by the plaintiffs—arguments that were also addressed in considerable detail in the extensive briefs and memoranda filed by the parties.

### A.  The 10400 South EA/4(f) & FONSI

As summarized above, the plaintiffs raise a series of objections to the EA/4(f) and FONSI issued by the FHWA as the predicate for its approval of UDOT's current 10400 South Project, and urge this court to find that the FHWA's action in approving the project based upon the EA/4(f) and FONSI was arbitrary, capricious and contrary to law.  They argue that the 10400 South Project will likely have a "significant" impact on the human environment in South Jordan, requiring the preparation of a full environmental impact statement—as was required by *Davis* as to the 11400 South project[75]—and indeed, that this and other projects warrant the preparation of a *regional* EIS covering multiple transportation projects in the southwest Salt Lake Valley.

---

[75]As *Davis* explained, "the basic issue is whether the Project will have a significant effect on the human environment such that an EIS, rather than a FONSI, should have been prepared. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.13.  Plaintiffs have the burden of showing that FHWA's decision not to prepare an EIS was arbitrary and capricious."  302 F.3d at 1117 (citing *Boomer Lake*, 4 F.3d at 1555).

According to plaintiffs, the agencies' pre-screening of alternatives based upon their consistency with local and regional transportation plans[76]—prior to conducting any detailed analysis—has resulted in approval of "a five-lane high-speed road where a three-lane will suffice,"[77] a decision made without taking a "hard look" at impacts and alternatives, thereby frustrating the policies of both NEPA and § 4(f).

Plaintiffs' challenge to the 10400 South EA/4(f)'s statement of purpose and need raises the question of the proper relationship between two processes: (1) the state, regional and local planning processes that generate transportation projects; and (2) the federal environmental assessment process that scrutinizes the impacts of those projects compared with reasonable, prudent and viable "alternatives."  If the plaintiffs are correct, the 10400 South EA/4(f)'s  stated purpose and need of "improving mobility" simply serves as a catch-phrase for an alternative's consistency with the specific criteria and goals of regional and local transportation plans crafted by UDOT, the WFRC, and the municipalities (*e.g.*, meeting Level of Service (LOS) "D" on specific traffic corridors in the year 2030).[78]  Alternatives that were not consistent with those plans, plaintiffs assert, were deemed not to "improve mobility" and were screened out of the environmental assessment process.

As *Davis* instructs, "While it is true that defendants could reject alternatives that did not

---

[76]Plaintiffs assert that at the outset, the agencies "rejected all but one of the initial alternatives from review in the EA/4(f) based upon inconsistency with the requirements of the WFRC LRP and local planning."  (Pltfs' Reply Br. at 19.)

[77](Transcript of Hearing, dated March 20, 2007 ("Tr. 3/20/07"), at 19:19-20 (Mr. Appel); *see id.* at 26:23-24 ("or a three-lane road with improvements on 9800 South will do it").)

[78](*See* Pltf's Reply Br. at 18-19 & n.7; *see* Pltfs' Br. at 7 ¶14 .)  Plaintiffs' counsel argued that the agencies "picked the attributes of an alternative that they wanted," presumably the proposed project, and "then you take the attributes of that preselected alternative and you make it part of your purpose and need" as a way to "eliminate . . . alternatives that otherwise deserve" more detailed scrutiny.  (Tr. 3/20/07, at 37:3-4, 37:7-15 (Mr. Appel).)

meet the purpose and need of the project, *Boomer Lake*, 4 F.3d at 1550, they could not define the project so narrowly that it foreclosed a reasonable consideration of alternatives."  302 F.3d at 1119 (citing *Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1174–75 (10th Cir. 1999); *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997)).  Thus, to satisfy the environmental assessment process,  the "purpose and need" of the project—initially determined through the planning process—must be defined to embrace a range of possible solutions beyond the specific project that the planning process has generated.  Otherwise the outcome of the assessment seems to be predetermined, with the proposed project being the only "alternative" that meets its own "purpose and need."[79]

On the other hand, the project's purpose and need cannot be divorced completely from the planning process that generated the proposed project in the first place.  Pursuant to Congressional mandate, *see* 23 U.S.C.A. § 134, the WFRC long-range planning process identifies the specific existing and future needs that transportation projects are designed to meet.  If "purpose and need" were to be defined for NEPA purposes in total isolation from the existing regional and local transportation plans, the federal environmental assessment process would soon supplant the regional and local planning process envisioned by Congress, and the evaluation of alternatives would soon become transportation planning *de novo* on the part of the FHWA.[80]

---

[79]This appears to be the problem with "purpose and need" described in *Davis*: "if the purposes and needs of the Project were so narrowly construed as to mandate the extra capacity only at 11400 South, we would conclude that such a narrow definition would be contrary to the mandates of NEPA."  302 F.3d at 1119-20.

[80]It appears that this point was not lost upon plaintiffs' counsel: "I think the purpose is to find a way to move people through this area, . . . We are talking mobility."  (Tr. 3/20/07, at 24:16-19 (Mr. Appel).)

And if we're going to talk about quality of life then I would remind the Court that 87 percent of people in the 11400 South area want it open space.  The same number want better master planning.  And the key to all this is that more and bigger roads . . . aren't necessary to meet this purpose, and don't meet

(continued...)

-39-

Neither NEPA nor § 4(f) may fairly be read to mandate that.

In this case, it comes down to this: the plaintiffs insist that the actual purpose and need of the 10400 South Project can be met by something less expansive than a five-lane highway on a 106-foot right-of-way on 10400 South, but that UDOT and the FHWA gave little or no consideration to that possibility in the environmental assessment process.[81]  The agencies respond that a three-lane road would lack the requisite traffic capacity, and a four-lane road with no median or center lane would be cumbersome (*e.g.*, left-hand turns from both inside traffic lanes), congested and dangerous (*e.g.*, more frequent head-on collisions, greater risks to pedestrians).[82]

As in *Davis*, plaintiffs submit that the 10400 South EA/4(f)'s screening of alternatives came down to only *two*: the proposed project and a "no-build" alternative, with the latter—not surprisingly—being found by the EA/4(f) to be seriously deficient in meeting the purpose and need of the project.  And as in *Davis*, plaintiffs contend that this court should find that the EA/4(f) contains "an inadequate discussion of alternatives," because options differing from the proposed action "were dismissed in a conclusory and perfunctory manner that [does] not support a conclusion that it was unreasonable to consider them as viable alternatives," and that where only two alternatives were studied in detail—the no-build alternative and the preferred alternative—the "FHWA acted arbitrarily and capriciously in approving an EA/4(f) that does not

---

[80](...continued)
the quality of life purpose.  Where we quibble really is how this being done. . . .
* * * *
And NEPA's about finding the right way to solve the problem. . . .

(*Id.* at 25:1-9, 27:2-3.)

[81](*See* Pltf's Reply Br. at 22.)

[82](Tr. 3/20/07, at 178:2-179:7 (Mr. Samford).)

provide an adequate discussion of Project alternatives." 302 F.3d at 1122. Yet winnowing the alternatives down to two "finalists" does not by itself demonstrate the agencies' failure to comply with NEPA requirements. *See, e.g.*, *Utah Environmental Congress v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006) (holding that Forest Service examined a reasonable range of alternatives and did not act arbitrarily when it considered only the no-action alternative and the modified proposed action).

"In deciding whether the [agency] acted arbitrarily by not considering certain alternatives, we remain mindful that an agency decision concerning which alternatives to consider is necessarily bound by a rule of reason and practicality." *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir. 1996). "[A]n agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, . . . impractical or ineffective." *Id.* Applying a rule of reason and practicality, this court is not persuaded that the FHWA's consideration of alternatives to the 10400 South Project as delineated in the EA/4(f) was arbitrary, capricious, "reverse-engineered," or pre-determined.

Nor is the court persuaded that the 10400 South EA/4(f)'s treatment of direct, indirect and cumulative impacts of the project was arbitrary, capricious or contrary to law. Recalling that a court reviews the agencies' actions under NEPA only to "insure that the agency has taken a 'hard look' at environmental consequences," *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976), this court is satisfied that UDOT and the FHWA took the requisite "hard look" at the 10400 South Project's impacts.

Just as the environmental assessment in *Davis* understated the 11400 South project's impact in the form of induced economic growth, the plaintiffs insist that the 10400 South EA/4(f)

-41-

overlooks the effects of a high-speed five-lane road in stimulating greater commercial/industrial

growth to the detriment of the residential character of the area:

> People are not going to want to live there.  If no one wants to live there, then what
> are the people who own the property going to do with those homes?  They are
> going to sell it to someone who doesn't want to live there, which means it
> becomes industrial, commercial, something very different, a lot like what you see
> when you drive down – up and down I-15.  That's what it turns into.[83]

The agencies point to projections indicating that the South Jordan area will be completely

built out with residential and commercial structures by the year 2030, whether 10400 South is

widened now or not.  The 10400 South EA/4(f) addresses the social and economic impacts of

widening the road now, but it reaches different conclusions about impacts than those urged by the

plaintiffs.

Whether the various impacts described in the EA/4(f) are "significant" in the eyes of

NEPA is not a simple question.  Having reviewed the pertinent materials, including the page-

long definition of "significantly" as used in NEPA that is currently set forth in the CEQ

regulations, *see* 40 C.F.R. § 1508.27 (2006), this court cannot say that in the context of the 10400

South Project, the FHWA acted arbitrarily or capriciously in concluding that the project's

impacts are not so "significant" as to require the preparation of an environmental impact

statement.  That reasonable minds may differ on this point does not empower this court to

overturn the agency's determination.  To prevail, the plaintiffs must show that the FHWA's

conclusion of non-significant effect on the environment represents a "clear error of judgment,"

that is, an abuse of agency discretion.  *Davis*, 302 F.3d at 1112.  This court finds no such error.

Plaintiffs may well be correct in asserting that the EA/4(f) could have been more accurate

---

[83](Tr. 3/20/07, at 31:9-16 (Mr. Appel).)

and more thorough in its evaluation of the project's impacts, but complete accuracy and

exhaustive thoroughness are not the measures of compliance with NEPA, at least as far as

judicial review of agency action is concerned.  To obtain a judicial remedy, plaintiffs must show

not only that the FHWA was wrong, but that the agency was arbitrarily or capriciously wrong in

its evaluations and its judgment.  They have not done so in this case.

The plaintiffs' critique of the agencies' § 4(f) analysis asserts that based on the existing

record, the FHWA could not find that there are no feasible or prudent alternatives to the proposed

action, starting with a three-lane or four-lane alternative to the proposed action to be constructed

on a narrower and less obtrusive right-of-way—alternatives that plaintiffs argue were ignored by

the 10400 South EA/4(f), even though they likely would bypass both of the § 4(f) historic

buildings that find themselves in the path of one or another of the wider five-lane alternatives.

As *Davis* explains: "Whether an alternative is 'prudent' involves a common sense

balancing of practical concerns, but § 4(f) requires the problems encountered by proposed

alternatives to be truly unusual or to reach extraordinary magnitudes if parkland is taken.

Nevertheless, an alternative that does not solve existing or future traffic problems may properly

be rejected as imprudent."  302 F.3d at 1120 (citing *Associations Working for Aurora's Res.

Env't*, 153 F.3d 1122, 1131 (10th Cir. 1998) (internal quotation and citations omitted)).  UDOT

and the FHWA insist that the other alternatives screened out in the 10400 South EA/4(f) would

not solve future traffic problems anticipated on 10400 South by the year 2030 and may thus be

deemed imprudent for §4(f) purposes.

The § 4(f) resources in question on 10400 South are two historic homes and two historic

canals; one home would be razed by the "preferred alternative" and both canals would be boxed

in wider culverts under any 10400 South alternative other than a "no-build" alternative.  The EA/4(f) discusses these impacts, as well as the inadequacy of other alternatives in meeting future traffic demand on the corridor, and given the lack of an adequate "full avoidance alternative," the record reflects the agencies' efforts to minimize impacts on the two canals and to preserve the historical artifacts of the house to be razed.

Applying the three-step analysis delineated in *Davis* and *Boomer Lake*, this court concludes (1) that the FHWA plainly acted within its authority in approving the 10400 South Project; (2) that the FHWA's approval of the proposed action was not arbitrary, capricious or an abuse of discretion; and (3) that the FHWA followed the necessary procedural requirements in reaching his decision, both in the FHWA's examination of alternatives and the agencies' efforts to minimize adverse impacts on the affected § 4(f) resources.

### B.  The 11400 South FEIS/4(f) & ROD

As summarized above, the plaintiffs find similar flaws with the 11400 South FEIS/4(f), and argue that UDOT and the FHWA have largely failed to comply with the court of appeals' mandate in *Davis* that they take the requisite "hard look" at the project's impacts and alternatives to the proposed action.  They dispute the FEIS/4(f)'s state purpose of improving "quality of life," arguing that the FEIS/4(f)'s examination of the project's purpose and need focused exclusively on increasing mobility and economic development—neither of which, in plaintiffs' view, improve or enhance quality of life.[84]  They also dispute any need for increased mobility or economic development at 11400 South, arguing that "[e]conomic development is going to happen anyway," and that "there is no apparent mobility need that's not being met within the

---

[84](*Id.* at 90:11-91:24, 93:5-19.)

study area.  All the problems again are next to I-15, . . . along 104th and along 126th/123rd South

into the 2030 time frame."[85]

Mobility problems, if they exist on east-west corridors at all, say the plaintiffs, are found

along the fringes or beyond the boundaries of the 11400 South FEIS/4(f) study area, warranting

the delineation of a larger study area: "if you wanted to create a larger study area and include

104th, 106th, and 123rd in that, maybe going down to 72nd South or 90th [South], you could

have a legitimate need to improve mobility through the study area."[86]  Moreover, plaintiffs would

shift the focus of traffic mobility analysis to distinguish between "true east-west" and "true north-

south" traffic flows in a regional study area, insisting that any need to improve mobility arises

largely from increasing north-south traffic flows, not east-west flows in the vicinity of 11400

South.  Increasing east-west traffic, plaintiffs suggest, consists of motorists seeking a north-south

corridor.[87]  The agencies respond that mobility problems exist at the periphery of the study area

rather than on 11400 South itself because as it stands, 11400 South is not an east-west

thoroughfare; it is a two-lane road coming to dead ends on both sides of the Jordan River.[88]

The agencies' delineation of the boundaries of the EIS study area for the 11400 South

Project at first glance seems quite narrow, as the plaintiffs suggest, particularly in light of the

court of appeals' comments in the *Davis* opinion.  Yet upon closer examination of the 11400

South FEIS/4(f), the defined study area boundary proves to be a permeable one; the agencies'

---

[85](*Id.* at 93:17-94:15.)  This argument seems to be at least somewhat disconnected from the plaintiffs'
contentions concerning the need for the 10400 South Project and the significance of induced growth.

[86](*Id.* at 94:25-95:4.)

[87](*Id.* at 104: 10-105:5.)

[88](*Id.* at 195:18-196:8 (Mr. Malmquist).)

analysis of alternatives and impacts often ranges beyond the defined study area boundaries to consider components and factors having a significant bearing upon the evaluation of 11400 South Project alternatives (*e.g.*, the traffic capacity of the recently constructed 9800 South corridor; the traffic capacity and potential widening of the Mountain View Corridor).  Nor did the FEIS/4(f) ignore the newly constructed river crossing at 9800 South—consideration of which was urged by *Davis* before it was built.

The plaintiffs also assert that the traffic modeling underpinning the FEIS/4(f)'s screening of alternatives already comprehends the future north-south and east-west traffic flows both inside and outside of the FEIS study area.  The agencies submit that

> [i]n cases such as this, where agency decisions are based on modeling and expert analysis, it is not the role of the Court to choose between differing studies or differing expert views.  A federal court does not sit "as a 'super professional transportation analyst' or decide which party utilized the better methodology in conducting its . . . analysis.  Rather, the district court simply determined whether the appellees' choice of methodology had a rational basis, consistently applied, taking relevant considerations into account." *Druid Hills Civic Ass'n v. Federal Highway Admin.*, 772 F.2d 700, 711 (11th Cir. 1985).

(Defs' Resp. Br. at 10 (footnote omitted).)  *See also Lee v. United States Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004) (noting that agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d at 1171 (same); *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 64 (4th Cir. 1991) (applying the arbitrary and capricious standard to the selection of a model by the agency); *Natural Res. Def. Council v. Herrington*, 768 F.2d 1355, 1385 (D.C. Cir. 1985) (holding that the court "will defer to an agency's judgment to use a particular model if the agency examines the relevant data and articulates a reasoned basis for its decision").

-46-

The traffic modeling relied upon by the agencies in generating the 11400 South Project and evaluating alternatives comprehends nearly 40 current regional transportation plans, federal and state, as well as the projected traffic demand for the region within and beyond the study area boundaries.  It takes into account the phasing of plans from now through 2030, including increased mass transit development that may affect the study area.  Alternatives to the proposed action are thus evaluated using projections that take into account that larger context.[89]

While the plaintiffs dispute the methodology used and conclusions drawn from the agencies' traffic modeling, they have not persuaded this court that the agencies' traffic modeling and the analysis flowing from that modeling lacked a rational basis, lacked consistency, or failed to take relevant considerations into account.  Expert opinions do clash over the efficacy of one approach to traffic flow analysis compared with another.   But disagreement between experts often does not present an "either-or" question, and each of the opinions may be footed upon its own rational basis.

Here, neither NEPA nor § 4(f) call upon this court to resolve those differences of expert opinion—to make a *de novo* determination of the comparative accuracy of the experts' contrasting approaches to traffic modeling, or to choose between differing interpretations of the modeled data.  Those choices are for the FHWA, not the court.  Instead, this court must decide whether the agencies' choices of method and interpretation as to the modeling of traffic data had a rational footing.   Based upon the record now before us, this court concludes that they did.

Perhaps the plaintiffs' most cogent critique of the 11400 South FEIS/4(f) concerns the

---

[89](*Id.* at 201:18-203:9; *see also* Transcript of Hearing, dated March 21, 2007 ("Tr. 3/21/07") at 4:12-5:7 (Mr. Malmquist).)

agencies' § 4(f) analysis of the project's use of one key § 4(f) resource—the Jordan River Parkway.  Plaintiffs point out that "[t]he Jordan River Parkway between 104th South and 123rd South represents the last unbridged section of the Jordan River Parkway in this area.  It is quiet and peaceful," they say, "but will not remain so when the road is built."[90]  They submit that several reasonable, feasible and prudent alternatives exist—some discussed in the FEIS/4(f) and some not—that would not require a new river crossing at 11400 South to achieve substantially the same results in terms of "increasing mobility" in the area.

The agencies respond that the "preferred alternative" causes the least net harm to § 4(f) resources because it "uses" fewer § 4(f) resources than any other alternative considered in the FEIS/4(f): "there were no[] feasible and prudent alternatives to the 11400 South Project which would impact fewer Section 4(f) resources than the proposed project."[91]  They also define the identified § 4(f) resources quite narrowly, minimizing the extent of the "use" of those resources requiring a detailed § 4(f) analysis.

The plaintiffs reply that the evaluation of adverse impacts to § 4(f) resources should be *qualitative* in nature rather than quantitative, and that adverse impacts to a major public parkland resource such as the Jordan River Parkway should weigh more heavily than less significant adverse impacts to a larger number of other § 4(f) resources (*e.g.*, historic structures).  Throughout the 11400 South FEIS/4(f), counsel asserts, "the impacts to this enormously

---

[90](Tr. 3/20/07, at 11:14-18 (Mr. Appel).)

[91](Defs' Resp. Br. at 79 (citing 49 U.S.C. § 303(c)).)  Having identified nine § 4(f) park, recreation and wildlife resources and 46 historic properties within the 11400 South Project study area, the agencies determined that there was no full avoidance alternative available that would meet the project's purpose and need.  Given that finding, the agencies focused on minimizing adverse impacts to § 4(f) resources, concluding that the proposed project should be the preferred alternative because it adversely affects the fewest § 4(f) resources.

important resource are minimalized and marginalized. . . . [T]he EIS stacks the Jordan River

Parkway into the analysis as the equivalent of the taking under 4(f) of a single historic home; you

get a quantitative measure of how many § 4(f) resources are affected, but they never talk about

qualitatively."[92]

The potential adverse impacts of the 11400 South Project on § 4(f) resources immediately

prove to be greater than those of the 10400 South Project.  A Jordan River crossing already exists

at 10400/10600 South, and the proposed project widens a little more than two miles of that road

at some distance from the river and its parkway.  In contrast, the 11400 South Project

contemplates construction of a new Jordan River crossing a short distance away from the existing

crossings at 10400/10600 South and 12300 South.

As the court of appeals noted in *Davis*, the construction of that new crossing was far from

a foregone conclusion in the prior environmental assessment process: "Although the scope of the

Project certainly contemplates additional road capacity across the Jordan River, we do not

believe that a fair reading of the Project purposes and needs requires that this additional capacity

necessarily be achieved by extending 11400 South across the Jordan River."  302 F.3d at 1119.

Under NEPA analysis, *Davis* observed that "if the Project did narrowly express its purposes and

needs as requiring a new crossing across the Jordan River at 11400 South, we would conclude

that such a narrow definition of Project needs would violate NEPA given the more general

overarching objective of improving traffic flow in the area."  *Id.*  For purposes of § 4(f) analysis,

---

[92](Tr. 3/20/07, at 107:12-22 (Mr. Appel).)  The plaintiffs also point to adverse impacts on Willow Creek Park that will result from the "preferred alternative." (*See id.* at 107:1-3.)  In 2002, *Davis* noted that the park land remained in private ownership and thus was not a § 4(f) resource.  302 F.3d at 1118.  The current record reflects that the future development of the park has become a matter of conveyance and joint agreement between UDOT and the City of Draper, which the agencies submit still lies beyond the reach of § 4(f).  (Tr. 3/21/07, at 22:5-23:8 (Mr. Samford).)

*Davis* pointed out that materials in that record indicated that

> substantial traffic benefits could alternatively be obtained by expanding capacity over the Jordan River at 12300 South and 10600 South and by constructing a new crossing at 9800 South.  Nothing . . . in the record that we have seen justifies a conclusion that these alternatives are not practical, reasonable, and perhaps in some instances even preferable to a crossing at 11400 South.

*Id.* at 1121.

Based upon consultation with the Utah Department of Parks and Recreation, the agencies submit that the affected § 4(f) resource on the Jordan River Parkway consists of a 12-foot-wide recreational pedestrian/bicycle trail running along the east and west sides of the river, and nothing more.  They assert that the FEIS/4(f)'s preferred alternative makes significant effort to minimize the impact of a new river crossing at 11400 South upon the trail (by moving part of the trail to accommodate the bridge),[93] and thus complies with the requirements of § 4(f) in this context.  Other alternatives calling for greater expansion of the 12300 South Corridor would also adversely impact several public park lands, and those impacts would not be so easily mitigated.  They submit that the FEIS/4(f) took a hard look at both qualitative and quantitative impacts, and that such impacts were taken into consideration in preparing the FHWA's Record of Decision.  Moreover, the state and local agencies having jurisdiction over the § 4(f) resources in question were consulted during the FHWA's NEPA/§ 4(f) process, and have opined that the proposed 11400 South river crossing would not have a significant adverse impact on those resources.

UDOT and the FHWA insist that after the remand in *Davis*, they took a "very hard look" at the § 4(f) resources impacted by the 11400 South Project, and determined that if properly

---

[93](Tr. 3/21/07, at 23:9-26:14 (Mr. Samford).)  Counsel for the agencies suggests that relocating the recreational trail to accommodate the bridge would not be a "use" of a § 4(f) resource requiring any impact analysis, citing *Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 533 (9th Cir. 1994).  (*Id.* at 26:15-27:3.)

mitigated, the adverse impacts of the preferred alternative on those § 4(f) resources would in fact be minimal.

While the agencies have reached that conclusion at least in part by minimizing the § 4(f) *resources* in a qualitative sense—a twelve-foot-wide path becomes "recreational" only by virtue of its essential setting in a naturally aesthetic riverside parkway—the court is satisfied that the FHWA's § 4(f) analysis as to the 11400 South Project satisfies the requirements of the statute.

## A REGIONAL EIS FOR TRANSPORTATION PROJECTS

The plaintiffs urge this court to order the agencies to prepare a new *regional* environmental impact statement that would encompass an additional thirty-some transportation projects now planned for the larger area surrounding the 10400 South and 11400 South study areas. Yet they acknowledge that a regional EIS is not strictly required by NEPA or the applicable regulations, and that the scope of a transportation project EIS ordinarily remains a matter committed to the discretion of the FHWA. The CEQ and FHWA regulations cited by the plaintiffs that discuss preparing a single EIS for actions that are "connected," "cumulative," or "similar," speak in terms of what agencies "may" or "should" do, without imposing a mandatory requirement for preparation of a single EIS encompassing multiple projects. *See* 40 C.F.R. § 1508.25 (2006); 23 C.F.R. § 771.111(f) (2006); *see also Blue Mountain Biodiversity Project v. Bosworth*, 383 F. Supp. 2d 1285, 1297 (D. Or. 2005) ("Where the proposed actions are 'similar,' the agency 'may wish' to assess them in the same document and 'should do so' when a single document provides 'the best way to assess adequately the combined impacts of similar actions. . . .'" (quoting *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989, 999 (9th Cir. 2004))).

UDOT and the FHWA respond that the existing WFRC regional transportation plans are not federal agency actions subject to the EIS requirement—an exemption recently made explicit by Congressional amendment—and that several of the projects identified by the plaintiffs will not draw on federal funds and thus are not federal agency actions subject to NEPA requirements. Nonetheless, they continue, the effects of those projects on traffic flow, including the effects of the phasing of those projects over a twenty-five year period, has been built into the traffic modeling used to evaluate the 10400 South and 11400 South projects, and thus they have already been taken into account in preparing the 10400 South EA/4(f) and the 11400 South FEIS/4(f).  In any event, the fact that projects originate in a regional transportation plan addressing regional transportation needs does not *require* that their environmental impacts be evaluated in a single regional EIS.

This court is persuaded that the FHWA did not abuse its discretion in deciding to issue a separate environmental assessment or EIS for each individual project rather than a single, more expansive regional EIS embracing most or all of the projects generated from the WFRC regional transportation plan.  Absent a breach of a mandatory legal duty to issue a regional EIS, plaintiffs have established no sufficient legal basis for this court to enter an order requiring the agencies to prepare one.

**CONCLUSION**

In matters such as this, it genuinely serves the public good to follow the process prescribed by Congress, even recognizing that the process itself may be arduous, that it may take years to complete, and that it may even bog down, costing millions of additional dollars in public funds.

The process prescribed by the statutes does not seek the ideal; it demands the adequate. The arduous public process undertaken with reference to these projects over a period of several years took the requisite "hard look" required of these agencies in assessing and evaluating impacts and alternatives, and in reviewing and approving transportation projects after receiving informed and interested public comment, as reflected in the extensive Administrative Record. They have indeed "let the public know that the agency's decisionmaking process includes environmental concerns." *Utahns for Better Transp.*, 305 F.3d at 1162.

The process did not attain the ideal, but it did achieve the adequate.

The FHWA's determinations concerning both projects were neither arbitrary nor capricious; nor were they an abuse of discretion or not in accordance with the law.

More than just a test of agency compliance with statutory requirements as to the process, the plaintiffs' foray in this case against the 10400 South EA/4(f) and the 11400 South FEIS/4(f) and ROD appears to be a challenge to growth itself.  Counsel pleads that the local area in which the plaintiffs now reside should simply be allowed to remain as it is—primarily rural and residential, quieter, more horse-friendly, less commercial and less traffic-congested than it will be as currently anticipated by the regional and local municipal planners with their intricate digital simulations of metropolitan area growth over the next quarter-century.[94]

But "NEPA does not work by mandating that agencies achieve particular substantive environmental results." *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 371 (1989). NEPA mandates a process that identifies and evaluates environmental results, providing an

---

[94](*See, e.g.,* Tr. 3/20/07, at 95:23-96:1 (Mr. Appel) ("And, again, all of this is happening in a study area where 87 percent of those polled favored more land set aside for open space.  They don't really want this to happen within the study area. . . . .").)

informed basis for public comment. The NEPA process accomplished those purposes in this case, and did so over a period of years, as reflected in the record; significant public comment was received and considered before approval was given to either the 10400 South Project or the 11400 South Project.

Even under § 4(f), which expresses a substantive preference for actions that avoid adverse impacts on those resources protected by the statute, UDOT and the FHWA have done an adequate job of identifying § 4(f) resources that may be impacted by construction of these projects, have screened prudent and feasible alternatives as to how well they minimize adverse impact, and have worked on planning with the relevant state and local agencies to further minimize and mitigate those adverse impacts that appear to be unavoidable if the purposes and needs of the projects are to be met.

The plaintiffs dispute those purposes and needs; they challenge method, interpretation and outcome as to data and impacts; they envision a differing array of alternatives than those formulated by the agencies; and, indeed, they would prefer to halt the trend of continuous metropolitan growth in its tracks, as least in the bucolic pastoral vicinage of Present-day South Jordan.

Again, reasonable minds may—and do—differ.

But the underlying issues of unbridled growth and urbanization at the core of the plaintiffs' claims pose fundamental questions of public policy far broader than the bounds of this lawsuit or the narrow scope of judicial review of administrative agency action under the pertinent statutes.  Those questions must ultimately be addressed in the context of the larger public forum because satisfactory answers necessarily must come from the community at large—however that

community may be defined.

For the foregoing reasons,

**IT IS ORDERED** that the plaintiffs' request for declaratory relief pursuant to the National Environmental Policy Act of 1969 (NEPA) and § 4(f) of the Department of Transportation act of 1966, 49 U.S.C. § 303(c), invalidating the FHWA's approvals of the 10400 South Project and the 11400 South Project, is hereby DENIED in all respects;

**IT IS FURTHER ORDERED** that the plaintiffs' request for injunctive relief prohibiting the defendants, *inter alia*, from acting upon the 10400 South Project and the 11400 South Project, as approved by the FHWA, is hereby DENIED in all respects; and

**IT IS FURTHER ORDERED** that the plaintiffs' request for declaratory and injunctive relief requiring the agencies to prepare and issue an Environmental Impact Statement comprehensive of all transportation projects planned for the southwest quadrant of the Salt Lake Valley is DENIED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED this _____ day of September, 2007.


BY THE COURT:


_____
Bruce S. Jenkins
United States Senior District Judge

-55-

community may be defined.

For the foregoing reasons,

**IT IS ORDERED** that the plaintiffs' request for declaratory relief pursuant to the

National Environmental Policy Act of 1969 (NEPA) and § 4(f) of the Department of

Transportation act of 1966, 49 U.S.C. § 303(c), invalidating the FHWA's approvals of the 10400

South Project and the 11400 South Project, is hereby DENIED in all respects;

**IT IS FURTHER ORDERED** that the plaintiffs' request for injunctive relief prohibiting

the defendants, *inter alia*, from acting upon the 10400 South Project and the 11400 South

Project, as approved by the FHWA, is hereby DENIED in all respects; and

**IT IS FURTHER ORDERED** that the plaintiffs' request for declaratory and injunctive

relief requiring the agencies to prepare and issue an Environmental Impact Statement

comprehensive of all transportation projects planned for the southwest quadrant of the Salt Lake

Valley is DENIED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED this **21** day of September, 2007.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge